**AFFIRMED; Opinion Filed December 28, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01165-CR

**CHADRICK OTIS HAVEN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F13-60734-N**

## MEMORANDUM OPINION
Before Justices Lang, Myers, and Evans
Opinion by Justice Evans

Chadrick Otis Haven was indicted for the murder of Marcellus Lewis, Jr. Appellant pled not guilty and, at trial, asserted self-defense. A jury convicted appellant of murder and assessed his punishment at 40 years' imprisonment. In five points of error, he complains that the trial court erred by sustaining the State's objections to the admission of Defense Exhibits 3, 4, and 5 which were "wanted posters" of the complaining witness; that the evidence is legally insufficient to prove he did not act in self-defense; and that the trial court erred by including an incomplete and improper limiting instruction in the jury charge. For the reasons that follow, we affirm the judgment of conviction.

# BACKGROUND

On August 24, 2013, twenty-year-old, Marcellus Lewis, Jr. was shot and killed by appellant because of a dispute over a parking space. Appellant never denied having shot Lewis but claimed that he acted in self-defense.

The evidence presented shows that at the time of his death, Lewis was living with his father, Marcellus Lewis, Sr., and his cousins, Yusuf Stephens and Swalee Jackson, at a duplex on Pennsylvania Avenue in Dallas. Lewis and his family had moved to Dallas from Oakland, California in August of 2012. Tyrone Gray was a member of the Outcasts Motorcycle Club and was nicknamed "Zero." Gray originally lived in the other side of the duplex. About a year earlier, Gray rented his half of the duplex to his cousin Antonio Shaw who lived there with his daughter, his common-law wife, Felicia Johnson, and Felicia's daughter by a prior relationship. The relationship between the neighbors was cordial, but they were not friends and did not socialize. Lewis and his family considered the driveway on their side of the duplex to be their parking area and told Shaw not to park there.

Both Stephens and Jackson testified regarding the circumstances surrounding the murder. On the night of the shooting, Lewis, Stephens, and Jackson were on the porch of their duplex discussing their plans for the evening. Members of the motorcycle club had contacted Shaw and told him that Zero had wrecked his motorcycle nearby and they needed him to bring his truck and pick it up. Several members of the motorcycle club accompanied Shaw when he returned to the duplex with Zero's motorcycle on his truck. When the bikers attempted to move the truck to the driveway to unload the motorcycle, Lewis told the group that they could not use the driveway. Lewis then went through the house to where his car was parked in back and moved it around to the driveway to prevent the bikers from parking in the driveway. After Lewis moved his car, words were exchanged between Lewis and one of the bikers – the biker called Lewis a

"bitch-ass," a "bitch-ass nigger." Lewis responded, "I'm going to show you a bitch," and went into the house. Stephens and Jackson tried to calm him down and prevent him from going out again but Lewis stormed out the front door. Just seconds after Lewis went out the door, Stephens and Jackson heard a pop that they thought was a gunshot. Stephens and Jackson ran outside and saw Lewis lying in the street and the bikers riding away. Lewis had no pulse and was unresponsive. Both Stephens and Jackson testified that Lewis did not own a gun and was not carrying one when he went outside.

When Lewis came out of the house that night, he was wearing blue-jeans, steel-toed boots, and no shirt. The jeans were loose enough that you could see his boxer shorts. There were tattoos on his chest and stomach. The tattoo on his stomach was the word "Killside." The "L" in "Killside" looked like a gun. Jackson explained that the street Lewis lived on in Oakland, California was called "Hillside" which was nicknamed "Killside" by the people who lived in the neighborhood. Lewis also had the word "Oakland" tattooed on his back. Lewis was five-feet seven inches tall and weighed 167 pounds.

Felicia Johnson was outside on the porch for most of the incident. She saw Lewis arguing with another man about the parking space and heard the biker call Lewis a "bitch." She saw Lewis go inside the house. She heard the biker tell someone to "Go get that thang" as he walked up and down the sidewalk using profanity. She then saw someone hand a gun to the biker. She saw Lewis come back out of the house, walk around the truck, and walk towards the biker with hands positioned like he was going fight. Johnson did not see Lewis carrying a gun in his hands or in his waistband. She heard the two men cussing at each other but did not see them touch. She testified that when Lewis lifted his arms up like he wanted to fight, the biker shot him. She saw Lewis fall to the ground and the bikers quickly leave the scene.

Detective Derryck Chaney investigated the murder. Initially, there were no suspects. He determined that appellant was the shooter after he was able to find some of the people who had been at the scene through fingerprints found on the truck and motorcycle. The detective first contacted appellant on September 26, 2013 and appellant came to the station for an interview on that same day. Appellant's interview was admitted into evidence and played for the jury. During the interview, appellant told the detective that he had to shoot in self-defense because Lewis had guns. Appellant said that after Lewis moved his car to block the driveway, he started to threaten the bikers, telling them that he was a "gangbanger" and "throwing sets" of gang signs. Appellant stated that Lewis said "be here when I get back" and "I got something for you" before he went back into the house. When Lewis came back outside, he had two guns. Appellant said that the two men who were with Lewis handed him one of the guns. Appellant told the detective that after Lewis came out of the house and Lewis walked towards him, he and appellant were talking at each other, with appellant telling Lewis things like "Chill out," "It ain't worth it," and "Don't do it." Appellant said that he hid behind the truck and when Lewis went around the truck and lunged at him, they started wrestling over the gun. Lewis then hit him with the hand holding the gun and appellant was able to get the gun away from him; appellant then pulled the trigger but did not see where he shot. Appellant stated that after he shot Lewis, he dropped the gun onto the ground and fled the scene on his motorcycle. He said he saw people moving the body and turning it over as other people sped to the scene, hanging out of their cars and pointing guns at him. Appellant told the detective that he did not come forward sooner because he knew that Lewis and others in his family were members of a gang, that the word on the street was that Lewis's father, who was also in a gang, had a hit out on him and his family; he did not want his name to become known and put him and his family in danger. During the interview, appellant

–4–

insisted that he did not have a gun on him that day, and that he was not aware that any of the other bikers that were there that day had a gun on them.

Detective Chaney testified that he attempted to investigate appellant's claim that threats had been made to him and his family after the shooting but could never find anything to support the claim because the person who made the allegation refused to talk to him. Detective Chaney also testified that he investigated what the tattoos "Killside" and "Oakland" meant but could not find any link to a gang, nor did he find any other reason to believe that Lewis or any of his family members were members of a gang. Detective Chaney testified that no other witness at the scene, other than appellant, told him that Lewis was throwing up gang signs or that there was a physical fight between appellant and Lewis prior to him being shot.

Donald Hendrix, also a member of the motorcycle club, testified that he too had gone to help get Zero's wrecked motorcycle and take it to the duplex. When he arrived at the duplex, he saw a car "burning rubber" coming out of the field next door to the house and drive fast up into the driveway. He heard Lewis get out of the car and curse at the bikers. He heard appellant call Lewis a "bitch-ass nigga" and heard Lewis say, "Who calling a bitch?" "Be right here when I get back. I got something for all of you motherfuckers." He saw Lewis go inside. He then saw Lewis come out of the house walking like he was in kind of a "pissed-off rage" towards appellant who was going towards his bike and trying to put on his gear so that they could leave. He testified that he saw that Lewis had a gun tucked in the waistband of his pants; Lewis had "sags" on and he could see the butt sticking up in front of his stomach in the underwear area. Hendrix testified that he never saw a gun in Lewis's hand. Hendrix then heard someone say "Don't do it," and heard a gunshot. At that point everyone scattered, including appellant. He testified that he did not see any fight or struggle between Lewis and appellant but stated that he might have been looking towards the house to see if anyone else was coming out with guns.

Hendrix testified that appellant was a big guy – six foot three and a half, or six foot four and 340 – 350 pounds.

Hendrix's interview with Detective Chaney was also admitted into evidence. During the interview, Hendrix told the detective that he did not see the gun, that the only thing he saw was Lewis's hand in his pants like he was holding something. He never saw a gun in Lewis's hand. He also told the detective that he did not see appellant with a gun but he assumed that appellant had a gun, stating, ". . . either Hawk took his gun or he had a gun, one of the two. I don't know."

Lewis was killed by a single gunshot wound to the face. The lack of soot or gunpowder residue around the entry wound indicated that the gun was a least three feet away from Lewis at the time it was fired. No gunshot residue was found on Lewis's hands. The absence of gunshot residue on his hands indicated that Lewis did not fire a weapon and was not in close proximity when a weapon was discharged. No bullet casings were found at the scene indicating that either the casing had been removed or the gun used was a revolver. No weapon was found at the scene.

## ANALYSIS

### Jury Charge Error

#### A. Incomplete Limiting Instruction

In Appellant's fourth and fifth issues for review, appellant complains about the limiting instruction included in the jury charge pertaining to self-defense.

During the trial, the defensive theory of the case was that appellant shot and killed Lewis in self-defense. The charge instructed the jury regarding self-defense in accordance with sections 9.31(a) and 9.32(a)(2)(A) of the Texas Penal Code. The self-defense instruction also contained the following limiting instruction:

> . . . The use of force against another is not justified if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was unlawfully carrying a weapon.

–6–

A person unlawfully carries a weapon if the person intentionally, knowingly or recklessly carries on or about his or her person a handgun if the person is not on the person's own premises or premises under the person's control.

"Actor" means a person whose criminal responsibility is in issue in a criminal action.

Appellant contends that the trial court erred when it issued this instruction because the instruction failed to include the exception under the unlawfully carrying a weapon statute which permits a person to carry a handgun or other weapon "inside of or directly en route to a motor vehicle that is owned by the person or under the person's control." TEX. PENAL CODE ANN. § 46.02(a)(2) (West Supp. 2015). In the alternative, appellant contends that the court erred when it issued the limiting instruction because it is not supported by the evidence.

The trial judge is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Vega v. State*, 394 S.W.3d 514, 518 (Tex. Crim. App. 2013) (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). Article 36.14 states that "the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). The trial judge has the duty to instruct the jury on the law applicable to the case even if defense counsel fails to object to inclusions or exclusions in the charge. *Vega*, 34 S.W.3d at 519. Article 36.14 imposes no duty on a trial judge to instruct the jury *sua sponte* on unrequested defensive issues because an unrequested defensive issue is not the law "applicable to the case." *Id.* (citing *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). A defendant cannot complain on appeal about the trial judge's failure to include a defensive instruction that he did not preserve by request or objection. *Id.*

However, if the trial judge does charge on a defensive issue (regardless of whether he does so *sua sponte* or upon a party's request), but fails to do so correctly, the result is charge

–7–

error subject to review under *Almanza.* *Barrera v. State*, 982 S.W.2d 415, 416-17 (Tex. Crim. App. 1998). If there was an objection, reversal is required if the accused suffered "some harm" from the error. If no proper objection was made at trial, a reversal is required only if the error caused "egregious harm." *Almanza v. State* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

We agree with appellant's argument that the limiting instruction should have also included the exception under the unlawfully carrying a weapon statute which permits a person to carry a handgun or other weapon "inside of or directly en route to a motor vehicle that is owned by the person or under the person's control." The fact that appellant was the person who shot Lewis was never in dispute. The State presented eye-witness testimony from Felicia Johnson that appellant had a gun and she saw appellant shoot Lewis. There was testimony from Detective Chaney that appellant did not have a concealed handgun permit. There was testimony from Donald Hendrix that when Lewis came out of the house and went towards appellant, appellant was going to his motorcycle and was trying to put on his gear. Based on this evidence, an instruction regarding the exception set forth in section 46.02(a)(2) should have been included in the charge. We conclude that the absence of this instruction resulted in an inaccurate charge.

Having found error in the court's charge, we must consider whether the error caused sufficient harm to warrant reversal. *See*, *e.g.*, *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). "Where, as here, the defendant did not raise a timely objection to the jury instructions, reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). Error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *See*, *e.g.*, *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013). In

–8–

making this determination, we examine (1) the entire charge; (2) the state of the evidence, including contested issues and weight of the evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). Egregious harm is a "high and difficult standard" to meet, and such a determination must be "borne out by the trial record." *Villarreal*, 453 S.W.3d at 433. Further, we will not reverse a conviction unless the defendant has suffered "actual rather than theoretical harm." *Id*.

### 1. The Jury Charge

We find three aspects of the charge noteworthy. First, it instructed the jury that it was unlawful for appellant to carry a handgun if he was not on his own premises, but did not instruct the jury that it is not unlawful for appellant to carry a handgun if he was en route to his motorcycle. This is significant since the evidence showed that appellant did not live in or have control of the duplex where the shooting took place. Under the charge, that fact was sufficient to abrogate appellant's self-defense claim, regardless of whether the jury believed appellant was justified in using deadly force.

Second, in addition to the general instruction on the law of self-defense and deadly force which we have just determined contained error, the charge failed to apply the law on self-defense to the facts of the case and did not instruct the jury to acquit if they had reasonable doubt on the issue of self-defense.[1] The charge did, however, instruct the jury that the "State is required to

---

[1] Where there is error in the abstract portion of a charge, we consider whether the application paragraph is correct because it "explains to the jury, in concrete terms, how to apply the law to the facts of the case." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). Accordingly, we should look to the application paragraph to determine whether the jury was correctly instructed in order to resolve a harm analysis. *Id*. Even if the application paragraph is correct, we conduct a harm analysis using the *Almanza* factors. *See Dougherty v. State*, PD–1411–05, 2006 WL 475802, at *1 (Tex. Crim. App. 2006) (per curiam) (not designated for publication) (reversing appellate court that did not conduct analysis using all *Almanza* factors after determining that the application paragraph was correct). So even though the briefs did not address the omission of an application paragraph pertaining to self-defense, we consider that omission from this charge as part of our harm analysis pursuant to *Almanza*. *See Yzaguirre*, 394 S.W.3d at 530.

disprove self-defense beyond a reasonable doubt," and that "The prosecution can disprove self-defense by proving its case beyond a reasonable doubt." The charge also contained numerous instructions pertaining to the jury's duty to consider all the evidence in the case and the State's burden to prove the case beyond a reasonable doubt, as well as instructions regarding the jury's duty to acquit if it has a reasonable doubt as to the appellant's guilt.[2]

Third, immediately following the instructions pertaining to the offense of murder and self-defense, the charge instructed the jury to consider the lesser included offense of manslaughter. A person commits the offense of manslaughter if he recklessly causes the death of an individual. TEX. PENAL CODE ANN. § 19.04 (West 2011). This instruction added a slight mitigating effect to the erroneous limiting instruction and lack of application paragraph on the law of self-defense because in considering this instruction, the jury necessarily considered the evidence which went to appellant's theory of self-defense.[3]

The jury charge, considered as a whole, leads us to conclude that the first *Almanza* factor weighs slightly in favor of finding egregious harm. *See Villarreal v. State,* 453 S.W.3d at 434-35. The incomplete limiting instruction, together with the instructions' failure to apply the law

---

[2] In this regard, the charge included the following instructions:

> All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt . . . The presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

> The prosecution has the burden of proving the defendant guilty and must prove each and every element of the offense charged beyond a reasonable doubt. It if fails to do that, you must acquit the defendant.

> . . . .

> In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you and these instructions, you shall acquit the defendant and say by your verdict, "not guilty."

[3] The record does not indicate which party requested this instruction, if any. We assume that the inclusion of this instruction was based upon appellant's statement to the police that he wrestled the gun from the victim and then pulled the trigger but did not see where he shot.

–10–

on self-defense to the facts of the case, allowed the jury to conclude that appellant's use of force was not justified because he was unlawfully carrying the handgun, as nothing in the charge alerted the jury that it could consider appellant's use of force justified because it could find that appellant's conduct with respect to his carrying a handgun was not unlawful if he was en route to his motorcycle. On the other hand, the jury was instructed numerous times regarding its duty to consider all of the evidence in the case and its duty to find the appellant not guilty if the State failed to prove the case beyond a reasonable doubt. Further, the inclusion of the instruction on the lesser included offense of manslaughter had the effect of necessarily refocusing the jury's attention on the evidence pertaining to appellant's claim of self-defense.

### 2. *The State of the Evidence*

Under this prong of an egregious harm review, we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge error caused appellant actual harm. *Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015). Appellant's theory of self-defense was presented through the statement he made to Detective Chaney which was admitted into evidence and played for the jury. During the interview, appellant insisted time and again that he did not carry a gun that day, nor was he aware of any of the other bikers carrying a gun that day. As for the circumstances of the shooting itself, appellant claimed that Lewis came out of the house with two guns and came towards him. Appellant hid behind the truck and when Lewis went around the truck, he lunged at appellant and they wrestled over the gun. Appellant was able to get the gun away from Lewis and then shot it. After shooting the gun, he dropped the gun onto the ground and fled the scene on his motorcycle.

The defense also presented testimony from another biker, which if believed, arguably supported appellant's claim that he did not have a gun and it was Lewis who had the gun.

–11–

Hendrix was at the duplex at the time of the shooting and did not see the shooting itself, but was outside when Lewis came out of the house and walked towards appellant. He testified that he saw that Lewis had a gun tucked in the waistband of his pants, but never saw a gun in Lewis's hand. He also told the detective that he did not see appellant with a gun but had assumed that appellant had a gun, stating, ". . . either Hawk took his gun or he had a gun, one of the two. I don't know."

If the jury considered appellant's theory of self-defense, whether appellant was carrying the gun lawfully or unlawfully was not at issue. Under appellant's self-defense theory, appellant never had a gun, only Lewis had a gun. Thus, we find that it is unlikely that the jury considered the limiting instruction when deciding the case.

Furthermore, in an egregious-harm analysis, it is appropriate to consider the plausibility of the evidence raising the defense. *Villarreal*, 453 S.W.3d at 436; *Allen*, 253 S.W.3d at 267-69. None of the State's witnesses testified that Lewis had a gun when he approached appellant. Both Stephens and Jackson, who saw Lewis leave the house to confront appellant, testified that Lewis did not own a gun and was not carrying one when he went outside. Johnson, an independent witness with no ties to either Lewis or appellant, was the only eyewitness to the actual shooting. She testified that she saw someone hand a gun to appellant while Lewis was in the house. She testified that when Lewis came out of the house, she did not see Lewis carrying a gun either in his hands or in his waistband. She testified that she saw Lewis walk towards appellant with his hands positioned like he was going fight and that when Lewis lifted his arms up like he wanted to fight, she saw appellant shoot him.

Except for appellant's own statement to the police, none of the other evidence presented at trial supported a justification defense. Although Hendrix testified during the trial that he saw that Lewis had a gun tucked in the waistband of his pants, his testimony was impeached by his

interview with the police in which he told Detective Chaney that he did not see the gun and that the only thing he saw was Lewis's hand in his pants like he was holding something. Furthermore, appellant's own version of events was not only in conflict with the testimony of every other witness at trial,[4] all of whom testified that Lewis was unarmed, but was also inconsistent with the physical evidence. For example, although appellant asserted that he wrestled the gun from Lewis and then shot, that assertion was rebutted by the fact that there was no soot or gunpowder residue around the entry wound and no gunshot residue found on Lewis's hands. The medical examiner testified that the lack of soot or gunpowder residue around the entry wound indicated that the gun was at least three feet away from Lewis at the time it was fired. The absence of gunshot residue on his hands indicated that Lewis did not fire a weapon and was not in close proximity when a weapon was discharged. Additionally, although appellant stated that after he wrestled the gun from Lewis and shot it, he dropped the gun onto the ground and fled the scene, no weapon or bullet casings were found at the scene.

In light of the entire record that shows that appellant's defensive evidence was weak, when viewed together with other evidence, we cannot conclude that there is a substantial risk that appellant was harmed as the result of the incomplete limiting instruction omitting the second exception under the unlawfully carrying a weapon and the omission of the application paragraph, or that the addition of the exception or application paragraph likely would have altered the outcome as to the question of whether he acted in self-defense. *See Villarreal*, 453 S.W.3d at 439. *Compare Allen,* 253 S.W.3d at 268 (concluding that, even had jury been properly instructed, it was "not likely" that jury would have found in defendant's favor as to defensive issue) *with Stuhler v. State,* 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (finding existence of

---

[4] Hendrix also testified that he did not see any fight or struggle between Lewis and appellant but stated that he might have been looking towards the house to see if anyone else was coming out with guns.

–13–

egregious harm, in part, because the "risk" of harm from erroneously omitted unanimity instruction was "substantial" in light of fact that "greater bulk" of State's evidence was devoted to establishing one theory of guilt over the other). The second factor weighs against finding egregious harm.

### 3. The Parties' Arguments

Under this factor, we look to whether any statements made by the State, appellant, or the court during the trial exacerbated or ameliorated error in the charge. *Arrington*, 451 S.W.3d at 844. In his closing argument, appellant's counsel urged self-defense and focused heavily on the statements made by appellant to the police, telling the jury numerous times to listen to the video. Counsel repeatedly mentioned appellant's statements pertaining to his assertion that it was Lewis who came at him with a gun and that he wrestled the gun from Lewis. Specifically, appellant's counsel argued:

> But ultimately, when it's all said and done, the evidence speaks for itself. He asked my client in the interview, Why didn't you run? I don't know anybody that can beat a bullet. At least I haven't met them.
>
> And that was the situation he was placed into. He talked about it. He says his bike was to his back, the truck to his left. He had nowhere to go when, this kid comes running and -- the boy, as they refer to. Listen to it. The video is in evidence. Listen to it at the end when he says, I didn't have any other choice.
>
> ….
>
> When you go in the deliberation room, look at the video, look at the end of it, look at the last couple of minutes of him speaking with Detective Chaney before he's taken away and arrested. . . .
>
> ….
>
> Now, when we look at what Mr. Haven knew, the only person that can talk about what happened those last few seconds before that gunshot was Mr. Haven. And he told you -- you can

look at the video. He said he heard him say, Don't be here when I get back.

He warned others to leave. He saw him come out of the house. He wrestled with him over the gun. A gunshot goes off. He had the best view of anyone. He believed that this individual was trying to kill him, and all the evidence, everything that's come in supports that belief.

When I look at the video I say what more can you say. For example, when you look at 2:13:02, when you look at that video, he says there was nothing more that I could do. If I hadn't done what I did, you would be investigating my murder.

….

The complaining witness' cousin says he wanted to prove himself, prove he was a man. And everyone also agreed that he ran out of that house -- I should say walked fast -- came out very quickly. Now, after that everybody's view got blurred, but one person saw it all, and that was Mr. Haven. You have to put yourself in his shoes. You have to look at what he saw at that time. You have to review all of the evidence from his perspective at that time from that one moment. If someone charges at you with a gun, what are you going to do? Oh, can we talk about this a little later? There was no time for that. Can we go call someone? There was no time. What do you do when someone is coming at you with a gun? What do you do?

Mr. Haven did the only anything that he could do. He wrestled him. He took the gun away from him and he defended himself the best way he knew how. You saw the evidence. You saw it. It's unfortunate. This is a very unfortunate situation. No one wants anyone to die under these circumstances. It's not what my client wanted. It's not what any of us wanted. But under these circumstances the law provides that you have the right to defend yourself, and that's what our client did.

Now, when you go in the jury room, I want y'all to read the charge. There is three ways this thing can go. First of all, we hope you find there is self-defense. You read that portion of it; that he was defending himself from bodily injury.

But it goes back to you have three choices. Guilty, not guilty or not sure. And if you're not sure, he's not guilty.

….

> We believe that self-defense applies here. And if any of you-all were in this same situation, we would want you-all to look at it from that same situation. Look at it as though you were in his shoes.

In its closing arguments, the State vigorously contested the validity of appellant's defense. Towards the end of its argument, the State made one reference to the limiting instruction, as follows:

> There is one thing I want to point out before I sit down, and it's on page 3 of the charge. And it says the use of force against another is not justified if the actor sought an explanation from the other person while the actor was unlawfully carrying a weapon.

> So what that basically means is if you're unlawfully carrying a weapon and you go to discuss your differences with somebody, you don't get self-defense. And you heard me ask Detective Chaney, did the victim have a concealed handgun permanent [sic]?

> No, he didn't. He was unlawfully carrying a weapon. He did not have the right to self-defense.

However, following these comments, the State concluded its argument by returning to the elements of self-defense:

> So now I'm going to ask that you follow the law; that you hold him accountable, because he had no right to use deadly force. It wasn't reasonable and he was under no imminent threat. I'm going to ask you to follow the law, remember the testimony you heard, and find him guilty.

Except for one relatively minor reference by the State to the limiting instruction, the arguments by both parties focused almost entirely on the elements of self-defense, thus alleviating the potential for jury confusion about the applicability of the limiting instruction on appellant's claim of self-defense. Therefore, we conclude this factor weighs against finding egregious harm.

### *4. Other Information in the Record*

We find one other factor relevant. While deliberating, the jury sent a note asking the court for a machine to watch a segment of the video. Since appellant's theory of self-defense was presented through the statement he made to Detective Chaney, this request is some indication that the jury did consider appellant's claim of self-defense in deciding the case. This factor, therefore, weighs against finding egregious harm.

### *Conclusion*

Consideration of the record as a whole does not support a conclusion that the appellant suffered egregious harm from the incomplete limiting instruction on self-defense. Nor can we conclude that the omission of an application paragraph on self-defense compels a finding of egregious harm. Significantly, under appellant's theory of self-defense, whether appellant was carrying the gun lawfully or unlawfully was not at issue. Further, the jury was given a general instruction on the law of self-defense and both appellant and the State focused heavily on the merits of appellant's claim of self-defense in their arguments before the jury. The charge also instructed the jury that the State was required to disprove self-defense beyond a reasonable doubt, and contained numerous instructions pertaining to the jury's duty to consider all the evidence in the case, the State's burden to prove the case beyond a reasonable doubt, as well as the jury's duty to acquit if it has a reasonable doubt as to appellant's guilt. Further, in light of the relative strength of the evidence indicating that appellant shot the unarmed Lewis as compared to the weaker evidence giving rise to appellant's justification defense, the chances that the jury would have actually harbored a reasonable doubt that appellant acted in self-defense were remote. Under *Almanza*, the record must demonstrate that appellant has suffered actual, not just theoretical, harm from the erroneous jury instructions. For the reasons given, we do not believe that appellant suffered actual harm. *See Vega*, 394 S.W.3d at 522 (appellant not egregiously

harmed when entrapment application paragraph failed to list both conditions under which the jury was authorized to acquit); *Arrington*, 451 S.W.3d at 845 (trial court's failure to give unanimity instruction with respect to six counts of aggravated sexual assault of child and one count of indecency with child by contact, arising out of multiple instances of criminal conduct, did not result in egregious harm); *Villarreal*, 453 S.W.3d at 443 (omission of a presumption-of-reasonableness instruction did not cause appellant egregious harm); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011) (no egregious harm when jury instructions permitted non-unanimous verdicts even though there were several instances of sexual criminal conduct that could have satisfied the charged offenses); *Allen*, 253 S.W.3d at 268 (failure to instruct jury that it had to acquit appellant on charge of simple assault if it had reasonable doubt as to whether victim consented to assault did not rise to level of egregious harm); *Barrerra v. State*, 10 S.W.3d 743, 746 (Tex. App.—Corpus Christi 2000, no pet.) (appellant did not suffer egregious harm from charge's failure to include an application paragraph on self-defense); *Lane v. State*, 957 S.W.2d 584 (Tex. App.—Dallas 1997, pet. ref'd) (failing to include culpable mental state in application paragraph did not cause appellant egregious harm). We overrule appellant's fourth issue.

### B. Limiting Instruction Supported by the Evidence

Appellant also contends that the trial court erred when it included the limiting instruction because there is no evidence that appellant sought an explanation from or discussion with the victim concerning their differences. Appellant claims that all of the evidence indicated that it was Lewis who sought the discussion, not appellant. We disagree.

The case law interpreting the limitation on the self-defense charge requires that there is evidence that the defendant against whom the limitation operates must be either seeking a discussion with or an explanation from the other party while unlawfully carrying a weapon.

*Hernandez v. State*, 309 S.W.3d 661, 664 (Tex. App.—Houston [14th Dist.] 2010 pet. ref'd); *Lee v. State*, 259 S.W.3d 785, 789–90 (Tex. App.—Houston [1st Dist.] 2007 pet. ref'd); *Fink v. State,* 97 S.W.3d 739, 743 (Tex. App.—Austin 2003, pet. ref'd); *Bumguardner v. State,* 963 S.W.2d 171, 175 (Tex. App.—Waco, 1998, pet. ref'd); *see also Kelley v. State*, No. 05-09-01438-CR, 2012 WL 2628074, *6 (Tex. App.—Dallas July 6, 2012, pet. ref'd) (not designated for publication). In determining whether an instruction on this limitation was proper, we view the evidence in the light most favorable to the jury's verdict. *Fink*, 97 S.W.3d at 743; *Kelley*, 2012 WL 2628074 at *7.

Viewing the evidence in the light most favorable to giving the instruction, the evidence shows that appellant and Lewis had a disagreement over who could park in the driveway next to Lewis's side of the duplex. They argued both before and after appellant attempted to unload the disabled motorcycle into the driveway. Further, there was testimony that while Lewis was in the house, appellant obtained a gun and was walking up and down the sidewalk using profanity. There was also testimony that after Lewis came back out of the house and walked towards appellant, appellant and Lewis were cussing at each other. During his interview, appellant told the detective that after Lewis came out of the house and Lewis walked towards him, he and appellant were talking at each other, with appellant telling Lewis things like "Chill out," "It ain't worth it," and "Don't do it." Hendrix testified that before he heard the gunshot, he heard someone say, "Don't do it." From the evidence, we conclude a rational jury could have found beyond a reasonable doubt that appellant and Lewis had their differences and that appellant "sought an explanation from or discussion with" Lewis concerning their differences. *See Lee*, 259 S.W.3d at 790 (holding that there was some evidence of appellant's effort to have a discussion with complainant when appellant walked down a driveway towards complainant with gun in his hand and told him, "You robbed me. You not going to rob me no more."); *Fink v.*

*State,* 97 S.W.3d at 743 (holding that trial court did not err by instructing jury on seeking an explanation when evidence showed that appellant went to his apartment after verbal altercation with complainant and immediately returned to scene armed with firearm "to see if the guy was coming after [him]"); *Bumguardner,* 963 S.W.2d at 175 (holding that evidence raised issue that Bumguardner sought an explanation from complainant because evidence existed that showed Bumguardner had differences with victim, demanded to know where his wife was, and yelled at victim while unlawfully carrying weapon). *See also Skief v. State*, No. 05-12-00223-CR, 2013 WL 2244336 (Tex. App.—Dallas May 21, 2013, pet. ref'd) (not designated for publication) (sufficient evidence from which a rational jury could find appellant sought an explanation from or discussion with the complainant after appellant's car suddenly swerved and struck or nearly struck the complainant); *Kelley*, 2012 WL 2628074 at *6 (instruction properly submitted when evidence showed appellant and complainant disagreed over appellant's presence in ex-wife's apartment and argued both through an open window and then again outside apartment before complainant was shot). The trial court did not err when it submitted the instruction.

Even if we were to hold that the trial court erred in giving the limiting instruction, which we do not, the result would be no different. As set forth in our analysis of harm from the jury charge error pertaining to the limiting instruction's failure to include the second exception under the unlawful carrying a weapon statute, consideration of the record as a whole does not support a conclusion that the appellant suffered egregious harm even if the instruction should not have been part of the jury charge. We overrule appellant's fifth issue.

### Sufficiency of the Evidence

In his third issue presented for review, appellant argues that the evidence is legally insufficient for a rational jury to have found that he did not act in self-defense.

We review the legal sufficiency of the evidence to support a jury's rejection of self-defense claim under the standard in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Wise v. State,* 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). In self-defense cases, this requires a court to review all of the evidence presented at trial in the light most favorable to the prosecution to determine if any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Saxton v. State,* 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). We are required to defer to the fact finder's credibility and weight determinations because the fact finder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson,* 443 U.S. at 326.

A person commits murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE Ann. § 19.02(b)(1), (b)(2) (West 2011). The jury was also instructed on the definition of self-defense in accordance with the applicable law. [5] A person is justified in using force when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (West 2011). A person is also justified in using deadly force against another when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. TEX. PENAL CODE ANN. § 9.32(a)(2)(A) (West 2011). The court's charge

---

[5] As previously discussed, appellant also alleges that the jury charge contained an incomplete limiting instruction because it failed to include the language contained in section 46.02(a) which permits a person to carry a handgun if the person is inside of or directly en route to a motor vehicle that is owned by the person or under the person's control. In analyzing this issue, we found unassigned jury charge error because it failed to include an application paragraph on self-defense. We have found both these omissions to be error, but have further found that appellant did not suffer egregious harm. Sufficiency of the evidence must be measured against the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997).

also contained a limiting instruction that informed the jury that a defendant is not entitled to rely on a claim of self-defense if he was unlawfully carrying a weapon. The charge indicated that a person unlawfully carries a weapon if they are not in their own home or on a property that they control.

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant does so, the State then bears the burden of persuasion to disprove the raised defense. *Id.* The burden of persuasion does not require the State to produce evidence; it requires only that the State prove its case beyond a reasonable doubt. *Id.* A determination of guilt by the fact finder implies a finding against the defensive theory. *Id.*

The issue of self-defense is a fact issue to be determined by the fact finder, who is free to accept or reject the defensive issue. *Saxton,* 804 S.W.2d at 913-14. As the sole judge of the weight and credibility accorded any witness's testimony, the fact finder is free to believe or disbelieve the testimony of all witnesses, and to accept or reject any or all of the evidence produced by the respective parties. *Cleveland v. State,* 177 S.W.3d 374, 380 (Tex. Crim. App. 2005).

In support of his argument that the evidence is legally insufficient "to conclude that appellant wrongly determined that deadly force was immediately necessary to protect himself from Lewis' use or attempted use of deadly force," appellant points to evidence showing that Lewis came out of the house wearing work boots with steel toes[6] and no shirt[7] and "walked

---

[6] Regarding the steel toe boots, appellant points to the definition of "deadly weapon" and refers to authority standing for the proposition that a person who is wearing boots on his or her feet can use those boots as deadly weapons.

[7] Although not included in this argument in appellant's brief, at trial appellant elicited evidence which showed a tattoo on Lewis's' abdomen with the word "Killside" in large letters and the two letters "l" were illustrations of firearms.

deliberately and aggressively toward appellant exhibiting gang signs, using angry vulgarities . . . with his hands 'in a fighting posture,' 'ready to fight.'" He also points to Hendrix's testimony that Hendrix was fearful for his own life because he saw Lewis "coming out with the gun in his waist. . . ."

However, as the State points out in its brief, the jury heard evidence that Lewis was a much smaller man than appellant, only five-feet seven inches tall, weighing 167 pounds while appellant was six foot three and a half, or six foot four and 340 – 350 pounds. The State's eyewitness to the shooting testified that she saw appellant being handed a gun by one of the other bikers. All of the State's witnesses also testified that Lewis did not have a gun. In contrast, appellant's self-defense theory at trial was that Lewis was carrying either one or two guns as he approached appellant, and when Lewis lunged at him, appellant wrestled with Lewis and was able to get the gun away from him and shot it in self-defense.

As already set forth in this opinion, appellant's own version of events was not only in conflict with the testimony of every other witness at trial, but was also inconsistent with the physical evidence. The jury was the sole judge of witness credibility and the weight to be given to the witnesses' testimony. The jury was free to accept or reject the defensive evidence. Considering all of the evidence in the light most favorable to the verdict, we conclude a rational jury could have found appellant guilty of all of the elements of the offense beyond a reasonable doubt and rejected his self-defense claim. We overrule appellant's third issue.

**Exclusion of Evidence**

In appellant's first and second issues for review, appellant contends that the trial court erred in sustaining the State's objections to Defense Exhibits 3, 4, and 5. We find these claims to be without merit.

During the State's case-in-chief, appellant questioned Detective Chaney about his investigation of the complainant's background and his knowledge regarding the murder charges brought against the complainant in California prior to his move to Texas. Detective Chaney testified that the case was dismissed because Lewis was found to have acted in self-defense. In a hearing outside of the presence of the jury, appellant attempted to introduce Defense Exhibits 3, 4, and 5 which were described as copies of a "wanted poster" of the Lewis. Appellant argued for the admission of the exhibits based on the State's use of the term "boy" when referring to the complainant because the defense wanted "the jury to understand that this individual was not only a man at that age of 20, but he already had a history." The trial court sustained the State's objection on the grounds of relevance and Rule 404 of the Rules of Evidence.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). A trial court's decision will be upheld when that decision is within the zone of reasonable disagreement. *Id.*

Rule 404(b) provides that extraneous bad acts are not admissible to prove character conformity. TEX. R. EVID. 401(b)(1); *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998). When evidence of a person's character is admissible, Rule 405(a) limits the permissible method of proof to reputation or opinion testimony. TEX. R. EVID. 405(a); *Tate*, 981 S.W.2d at 192. Rule 405(b) permits proof of specific instances of the person's conduct "[w]hen a person's character or character trait is an essential element of a charge, claim or defense." TEX. R. EVID. 405(b). However, a victim's character trait is generally not an essential element of a claim of self-defense. *Campos v. State*, No. 11-14-00089-CR, 2016 WL 365375, *3 (Tex. App.—Eastland January 28, 2016, pet. ref'd) (not designated for publication) (*citing Tate*, 981 S.W.2d at 192-93).

–24–

On appeal, appellant argues that the "wanted posters" were admissible under Rule 404 because they rebutted the attempt by the State to color appellant's "character with a childish innocence" "with disinterested and certain evidence that Lewis had developed into a dangerous person." However, as pointed out in the State's brief, youth and a propensity towards violence are hardly mutually exclusive. The fact that the complainant had turned twenty weeks before he was killed was before the jury. The jury heard numerous witnesses testify about the complainant's hot temper and aggression on the night of the shooting. The fact that the complainant's character was generally aggressive was also before the jury. Johnson testified that this was not the first time she saw the complainant acting aggressively – she had seen the complainant knock someone out in front of the house "just for no reason". She also testified that he was known to be wild. Further, appellant elicited evidence which showed a tattoo on Lewis's abdomen with the word "Killside" in large letters and the two letters "l" were illustrations of firearms. Appellant also elicited testimony from Detective Chaney that one of the reasons the family moved to Texas from California was to keep Lewis out of trouble.

In his brief, appellant states that the wanted posters, "were impeachable evidence of the defects of Lewis' character" and "provided credible evidence of Lewis' malignant character." Appellant has failed to explain to the trial court, or to this Court, what admissible purpose the "wanted posters" was relevant to, other than to show the deceased's violent propensity toward persons other than appellant, and no other purpose is apparent. We conclude that the excluded evidence had no relevance apart from its tendency to prove the character of the deceased in order to show that he acted in conformity therewith. Therefore, the evidence was inadmissible and the trial court did not err in its exclusion. Appellant's first and second issues are overruled.

## CONCLUSION

We affirm the trial court's judgment.

/David W. Evans/
DAVID EVANS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
151165F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
# JUDGMENT

CHADRICK OTIS HAVEN, Appellant

No. 05-15-01165-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas

Trial Court Cause No. F13-60734-N.

Opinion delivered by Justice Evans, Justices Lang and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 28th day of December, 2016.